John DOE, John Roe, and Connecticut Harm Reduction Coalition, Plaintiffs,

v.

BRIDGEPORT POLICE DEPARTMENT and Wilber L. Chapman, Chief of the Bridgeport Police Department, in his official capacity only, Defendants.

CIV.A. No. 3:00CV2167JCH.

United States District Court, D. Connecticut.

Jan. 18, 2001.

RULING ON PLAINTIFFS' APPLICATION FOR PRELIMINARY INJUNCTION [DKT. NO. 1] AND MOTION FOR CLASS CERTIFICATION [DKT. No. 24]

HALL, District Judge.

The plaintiffs John Doe and John Roe[1] bring a putative class action, on behalf of themselves and a class of similarly situated injecting drug users, against the Bridgeport Police Department and its chief, Wilber L. Chapman, in his official capacity, for violation of the plaintiffs' fourth amendment rights to be free from illegal search and seizures, false arrest and malicious prosecution. The Connecticut Harm Reduction Coalition, a non-profit association organized to educate, train, and advocate for pragmatic public-health-oriented models of drug use prevention, treatment, and policy, is also a plaintiff in the action. The plaintiffs bring this action against the defendants pursuant to 42 U.S.C. § 1983.

The plaintiffs filed an Application for Temporary Restraining Order on November 13, 2000. The court held oral argument on the Application with both sides present on that day. On November 15, 2000, the court issued the following temporary restraining:

> Defendants Bridgeport Police Department and Wilber L. Champan, Chief of the Bridgeport Police Department, their agents, employees, assigns, and all persons acting in concert or participating with them are enjoined and restrained from searching, stopping, arresting, punishing or penalizing in any way, or threatening to search, stop, arrest, punish or penalize in any way, any person who is a participant in the Bridgeport Syringe Exchange Program, based solely upon that person's possession of up to thirty sets of injection equipment, whether sterile or previously-used and possibly containing a residue of drugs.

Ruling on Plaintiffs' Application for Temporary Restraining Order (Dkt. No. 18) at 26. Now before the court are the plaintiffs' request for a preliminary injunction and motion for class certification. At oral argument on December 15, 2000, the court, with the consent of both parties, consolidated the hearing on the preliminary injunction with a final trial on the merits and converted the request for a preliminary injunction to a request for a

permanent injunction, pursuant to Fed. R.Civ.P. 65(a)(2). For the reasons stated herein, the motion for class certification [Dkt. No. 24] and the request for a permanent injunction [Dkt. No. 1] are granted.

## I. FACTS

In 1990, the Connecticut legislature enacted Conn. Gen.Stat. § 19a–124 to mandate the establishment of an experimental needle and syringe exchange program in New Haven. In 1992, the legislature amended section 19a–124 to expand the needle and syringe exchange program to Bridgeport and Hartford and to, *inter alia*, "provide that program participants receive an equal number of needles and syringes for those returned, up to a cap of five needles and syringes per exchange." As part of another legislative enactment in 1992, Conn. Gen.Stat. § 21a–240(20)(A)(9) was amended (and renumbered as section 21a–240(20)(A)(ix)) by adding "in a quantity greater than eight" to provide in the criminal drug enforcement statutes' definitional section that:

> "Drug paraphernalia" refers to equipment, products and materials of any kind which are used, intended for use or designed for use in ... injecting, ingesting, inhaling or otherwise introducing into the human body, any controlled substance contrary to the provisions of this chapter including, but not limited to: ... (ix) *in a quantity greater than eight* hypodermic syringes, needles and other objects used, intended for use or designed for use in parenterally injecting controlled substances into the human body....

(emphasis added). Later in 1992, the legislature amended section 21a–240(20)(A)(ix) to increase the number of hypodermic syringes and needles from "eight" to "ten." In 1994, the legislature changed the limit in section 19a–124(b) from "five" to "ten" syringes and needles. In 1999, the legislature passed a bill which raised the quantity of hypodermic syringes and needles in section 19a–124(b) and in section 21a–240(20)(A)(ix) from "ten" to "thirty."

---

1. The court granted the Plaintiffs' Motion to Proceed under Fictitious Name [Dkt. No. 15] on

November 13, 2000.

The Bridgeport Public Health Department administers the Syringe Exchange Program ("Exchange") in Bridgeport. "The Exchange operates every day of the week during well-publicized hours," and "[c]lients may come to the Health Department during business hours for counseling, addiction treatment referrals, and to exchange injection equipment, or they may do so at the Exchange van, which travels to specified locations in Bridgeport." Dkt. No. 1 at ¶ 30. "As with other exchange programs, the Bridgeport Exchange provides sterile injection equipment in return for used equipment." *Id.*

The plaintiffs have filed declarations and affidavits of the plaintiffs John Roe and John Doe [Dkt. Nos. 9 & 10]; Robin Clark–Smith, the AIDS Program Coordinator for the Syringe Exchange Program of the Bridgeport Public Health Department [Dkt. No. 8]; Anthony Givens, a research assistant in the I–91 study, which researches how transmission of HIV and Hepatitis is related to how injecting drug users acquire, use, and discard syringes [Dkt. No. 11]; Mark Kinzly, a former coordinator of the Syringe Exchange Program of the Bridgeport Public Health Department and current coordinator of the I–91 study [Dkt. No. 6]; Dr. Robert Heimer, Associate Professor of Epidemiology and Public Health and Associate Professor of Pharmacology at the Yale University School of Medicine [Dkt. No. 7]; and Ricky Blumenthal, Associate So-

ciologist in the Health Program and Drug Policy Research Center at the RAND Corporation [Dkt. No. 5]. The plaintiffs later filed supplemental declarations of Heimer [Dkt. No. 25] and Kinzly [Dkt. No. 26]. The defendants have supplied affidavits of Jack McCarthy, Director of Health and Human Services of the Health Department of the City of Bridgeport [Dkt. No. 23, Ex. 1]; Rafael Villegas, a Bridgeport Police Department narcotics and vice officer [Dkt. No. 23, Ex. 3]; David Boston, deputy chief of the Bridgeport Police Department [Dkt. No. 23, Ex. 4]; Kathleen Burke, administrative secretary in the Narcotics and Vice Division of the Bridgeport Police Department [Dkt. No. 23, Ex. 5]; Clark–Smith [Dkt. No. 34]; Thomas E. Gecewicz, Director of Health of the City of Bridgeport [Dkt. No. 33]; and Jackie Cocco, a Connecticut state representative for Bridgeport and Fairfield [Dkt. No. 35].[2]

The Exchange "issues identification cards to injecting drug users who become participants."[3] Declaration of Robin Clark–Smith (Dkt. No. 8) at ¶ 2. The Exchange takes previously-used, potentially-infectious syringes out of circulation and thereby reduces the spread of HIV and other blood-borne diseases by increasing the availability of injection equipment and of access to medical services and substance abuse treatment for

---

**2.** The court recognizes the Second Circuit's rule that, "while affidavits may be considered on a preliminary injunction motion, motions for preliminary injunction should not be resolved on the basis of affidavits that evince disputed issues of fact," and that "[w]hen a factual issue is disputed, oral testimony is preferable to affidavits." *Davis v. N.Y. City Hous. Auth.*, 166 F.3d 432, 437–38 (2d Cir.1999) (citing *Schulz v. Williams*, 38 F.3d 657, 658 (2d Cir.1994), and *Forts v. Ward*, 566 F.2d 849, 851 (2d Cir.1977)). The court discussed this rule with the parties in a conference in chambers on December 15, 2000, and offered the parties the opportunity to present live testimony. Counsel for both sides acknowledged that the only area of any potential dispute—whether Exchange participants keep and carry their identification cards—will not be dispositive of the merits of this case, because both sides agreed that some Exchange participants lose or do not carry the identification cards and that the case does not turn on the exact percentage of participants that keep their cards. Accordingly, both sides agreed that, because no factual issue was really in dispute, no testimony

was required, and the court can decide the case on the record before it.

**3.** At the court's request, the defendants submitted a sample Exchange identification card to the court by letter dated December 21, 2000. The card is laminated and includes on one side "SYRINGE EXCHANGE PROGRAM PARTICIPANT, *Bridgeport Health Department*" and an identification number and code name, along with the address and phone number of the Bridgeport Health Department's Syringe Exchange Program. *See* Court Ex. I. The opposite side of the card includes the following message:

> The cardholder is an official participant in the Bridgeport Exchange, an approved exchange through the State of Connecticut. The cardholder is exempt from arrest and prosecution for the possession of syringes furnished to the cardholder by the Bridgeport Health Department. Public Act # 99–2, Connecticut General Statutes 19A—124.

*Id.*

injecting drug users. Declaration of Dr. Robert Heimer (Dkt. No. 7) at ¶¶ 24, 28. The Exchange requires injecting drug users to provide the Exchange with a previously-used syringe or needle in order to obtain new injection equipment. Declaration of Mark Kinzly (Dkt. No. 6) at ¶ 7; *see also* Bridgeport Health Department Needle Exchange Protocol (Dkt. No. 23, Ex. 2) at ¶ 7.

The plaintiffs argue in their Application for Temporary Restraining Order that the defendants continue to arrest and harass injecting drug users in Bridgeport, Connecticut, solely on the basis of the users' possession of hypodermic syringes and needles, whether sterile or previously-used. Dkt. No. 3 at 2. Givens states in his declaration that, "[w]hile working on the Bridgeport Exchange van, I frequently observed police harassment of Exchange clients." Dkt. No. 11 at ¶ 7.

The plaintiffs Doe and Roe are both injecting drug users and participants in the Exchange. Dkt. No. 1 at ¶¶ 5–6; Dkt. No. 10 at ¶¶ 4–6. Doe alleges that the Bridgeport police have "constantly interfere[d] with my ability to use the Exchange" by "often stop[ping] me, tell[ing] me to leave the area [of the Exchange], and threaten[ing] to arrest me." Dkt. No. 10 at ¶ 7. According to Doe, "[o]n several occasions, police officers have ordered me to hand over the injection equipment that I had just received from the Exchange" and "then have broken the syringes so that I could not use them." *Id.* Doe alleges that he was charged in Seaside Park with possession of drug paraphernalia on September 11, 2000, after the police officer confiscated the injection equipment that Doe received earlier that day from the Exchange. *Id.* at ¶¶ 8–16. The charge was nolled on November 7, 2000, when Doe appeared in court. *Id.* at ¶ 18.

Roe alleges that, on October 5, 2000, he was arrested on Shelton Street in Bridgeport by a Bridgeport police officer for possession of drug paraphernalia and possession of narcotics, after the officer seized the injection equipment which Roe was carrying with him. Dkt. No. 9 at ¶¶ 7–13. He was jailed for seven days pending bail, before bond was posted for him on October 13, 2000. The prosecutor dropped the charges against him on October 19, 2000. *Id.* at ¶ 13. Roe alleges that he offered to show the officers his Exchange identification card when he was initially stopped, but was rebuffed in this attempt. *Id.* at ¶ 12.

## II. MOTION FOR CLASS CERTIFICATION

The plaintiffs seek certification of a class of all injecting drug users, present and future, in Connecticut, pursuant to Fed.R.Civ.P. 23(b)(2). Plaintiffs' Motion for Class Certification and Memo. of Points and Authorities in Support (Dkt. No. 24) at 1–2. The defendants respond that "[t]he proposed class certification is too broad because it would be in direct violation of the intent of Conn. Gen. Stat. Secs. 21a–240(20)(A)(IX) and 19a–124 which cover only those individuals who are *participants* in the [Exchange] or who have in their possession up to 30 clean hypodermic needles or syringes." Defendants' Objection to Plaintiffs' Request for Class Certification (Dkt. No. 28) at 3. The defendants also argue on separate grounds that the plaintiffs cannot satisfy the requirements of Fed.R.Civ.P. 23(a).

To certify a class under Rule 23, the plaintiffs must satisfy the requirements of Rule 23(a) and one sub-section of 23(b).[4] *Marisol A. v. Giuliani*, 126 F.3d 372, 375–76

4. Rule 23 provides, in pertinent part:
   (a) Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

   (b) Class Actions Maintainable. An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:
   . . .
   (2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; . . . .
   Fed.R.Civ.P. 23.

(2d Cir.1997). The Second Circuit has recently discussed these requirements:

> The party seeking to certify a class bears the burden of demonstrating numerosity, commonality, typicality, and adequacy. *See* Fed.R.Civ.P. 23(a).... Before certifying a class, a district court must be persuaded, "after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." [*Gen'l Tel. Co. v. Falcon*, 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982) ].
>
> Nevertheless, a motion for class certification is not an occasion for examination of the merits of the case. *See Sirota v. Solitron Devices, Inc.*, 673 F.2d 566, 570–72 (2d Cir.1982). As the Supreme Court has stated, "[N]othing in either the language or history of Rule 23 ... gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177, 94 S.Ct. 2140, 40 L.Ed.2d 732 ... (1974).

*Caridad v. Metro–North Commuter R.R.*, 191 F.3d 283, 291 (2d Cir.1999).

The defendants argue that the court should not certify the proposed class if the court finds, as the defendants argue it should, that some or all of the injunctive relief sought should not be granted to the plaintiffs on the merits of the case. *See* Defendants' Objection to Plaintiffs' Request for Class Certification (Dkt. No. 28) at 2–3. The defendants, however, misconstrue the nature of the inquiry on a motion for class certification, which "is not an occasion for examination of the merits of the case." *Caridad*, 191 F.3d at 291 (citation omitted). Therefore, the court reject the defendants' objection on this ground.

The court further notes that the Second Circuit has held that " 'Rule 23 is given liberal rather than restrictive construction, and courts are to adopt a standard of flexibility(4)27' " *Marisol A.*, 126 F.3d at 377 (citation omitted). With the guidance of this holding and the *Caridad* ruling, the court will proceed in order through each of the elements of Rule 23(a) and 23(b)(3).

### A. Numerosity

Fed R. Civ. P. 23(a)(1) requires the court to find that "the class is so numerous that joinder of all members is impracticable." "[N]umerosity is presumed at a level of 40 members" of a putative class. *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir.1995) (citation omitted). However, "[c]ourts have not required evidence of exact class size or identity of class members to satisfy the numerosity requirement." *Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir. 1993) (citations omitted). "Determination of practicability depends on all the circumstances surrounding a case, not on mere numbers." *Id.* at 936 (citation omitted). "Relevant considerations include judicial economy arising from the avoidance of a multiplicity of actions, geographic dispersion of class members, financial resources of class members, the ability of claimants to institute individual suits, and requests for prospective injunctive relief which would involve future class members." *Id.* (citations omitted).

In this case, the plaintiffs have provided sufficient evidence that the proposed class of injecting drug users in Connecticut is so numerous that joinder of all members is impracticable.[5] *See, e.g.,* Plaintiff's Reply in Support of Motion for Class Certification (Dkt. No. 30) at 2 n. 2. The defendants themselves have produced undisputed evidence that more than 1,200 arrests have been made by the Narcotics and Vice Division and Tactical Narcotics Team of the Bridgeport Police Department alone for narcotics violations in calendar year 2000. *See* Affidavit of Kathleen Burke (Dkt. No. 23, Ex. 5) at ¶¶ 3–4. As such, the court finds that this element is satisfied with respect to a putative class of injecting drug users in Bridgeport.

### B. Commonality

Rule 23(a)(2) requires the court to find that "there are questions of law or fact

---

5. Counsel for the defendants conceded at oral argument on December 15, 2000, that the Plaintiff's Reply in Support of Motion for Class Certification [Dkt. No. 30] provides sufficient proof to satisfy the numerosity requirement.

common to the class." "The commonality requirement is met if plaintiffs' grievances share a common question of law or of fact." *Marisol A.*, 126 F.3d at 376 (citations omitted).

Here, the case involves a question of law common to all injecting drug users in Bridgeport: whether the defendants violate injecting drug users' fourth amendment rights by arresting them solely for the possession of less than thirty-one hypodermic syringes or needles, whether sterile or previously-used, or for the possession of trace amounts of narcotic substances contained therein as residue. This issue, in turn, depends upon the court's resolution of the issue of the legality of the possession of less than thirty-one hypodermic syringes or needles, whether sterile or previously-used, and of trace amounts of narcotic substances contained therein as residue. Accordingly, the court finds that the plaintiffs have satisfied the commonality requirement.

## C. Typicality

Rule 23(a)(3) requires the court to find that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Typicality "requires that the claims of the class representatives be typical of those of the class, and 'is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability.'" *Marisol A.*, 126 F.3d at 376 (citation omitted). "When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims." *Robidoux*, 987 F.2d at 936–37 (citations omitted). The Second Circuit has recently observed that the commonality and typicality "requirements 'tend to merge' because '[b]oth serve as guideposts for determining whether ... the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.'" *Caridad*, 191 F.3d at 291 (quot-

ing *Falcon*, 457 U.S. at 157 n. 13, 102 S.Ct. 2364).

Here, the plaintiffs allege the same legal arguments to prove the defendants' liability for violating the fourth amendment rights of injecting drug users in Bridgeport. The plaintiffs argue that the possession of less than thirty-one hypodermic syringes or needles, whether sterile or previously-used and whether empty or containing trace amounts of narcotic substances as residue, is legal under Connecticut law. Therefore, the plaintiffs argue, any arrest that is made solely on the basis of such possession violates the fourth amendment. The fact that some injecting drug users are active participants in the Exchange while others are not does not alter this analysis. Plaintiff Roe alleges that he was arrested for possession of less than thirty-one hypodermic syringes or needles after identifying himself as a participant in the exchange. *See* Declaration of John Doe (Dkt. No. 9) at ¶¶ 10, 13. However, plaintiff Doe did not seek to protect himself by identifying himself as a participant in the Exchange when he was arrested for possession of less than thirty-one hypodermic needles or syringes. *See* Declaration of John Doe (Dkt. No. 10). Accordingly, Doe placed himself in the same position legally as a non-exchange-program-participant with regard to the legal arguments made to support the putative class's Fourth Amendment claims. The plaintiffs Roe and Doe, injecting drug users in Bridgeport, are therefore typical of injecting drug users there, whether participants in the Exchange or not.

## D. Adequacy of representation

Rule 23(a)(4) requires the court to find that "the representative parties will fairly and adequately protect the interests of the class." This requirement "is motivated by concerns similar to those driving the commonality and typicality requirements, namely, the efficiency and fairness of class certification." *Marisol A.*, 126 F.3d at 378 (citing *Falcon*, 457 U.S. at 157 n. 13, 102 S.Ct. 2364). "Generally, adequacy of representation entails inquiry as to whether: 1) plaintiff's interests are antagonistic to the interest of other members of the class and 2) plaintiff's

attorneys are qualified, experienced and able to conduct the litigation." *Baffa v. Donaldson, Lufkin & Jenrette Secs. Corp.*, 222 F.3d 52, 60 (2d Cir.2000) (citation omitted). "[C]lass representative status may properly be denied 'where the class representatives have so little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class against the possibly competing interests of the attorneys.'" *Id.* at 61 (citation omitted). On the other hand, "[w]here there are legal issues common to the class, the representative who defends his own interests will also be protecting the interests of the class." *Consol. Rail*, 47 F.3d at 483–84 (citation omitted).

First, as to the adequacy of the putative class counsel, the court finds that a sufficient showing has been made in the plaintiffs' filings as well as at oral arguments that the plaintiffs' attorneys are qualified, experienced and well able to conduct this litigation as a class action. *See* Plaintiffs' Motion for Class Certification and Memo. of Points and Authorities in Support (Dkt. No. 24) at 6. Second, the court finds that the plaintiffs are adequate representatives of a class of all injecting drug users in Bridgeport. As discussed above regarding typicality, because there are legal issues common to the class, the plaintiff Roe and Doe will be protecting the interests of the class by advancing their own legal interests in the case, *i.e.*, to establish that possession of less than thirty-one hypodermic syringes or needles, whether sterile or previously-used, and of trace amounts of narcotic substances contained therein as residue, is legal in Connecticut and therefore that the defendants violate the fourth amendment rights of drug users by arresting users for such possession. Moreover, in a putative class action seeking only declaratory and injunctive relief, as here, the court finds very little reason for concern that the class representatives will have so little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class against

the possibly competing interests of the attorneys.

**E. Requirements of Rule 23(b)(2)**

██ "Rule 23(b)(2) permits class actions for declaratory or injunctive relief where the party opposing the class has acted or refused to act on grounds generally applicable to the class. Civil rights cases against parties charged with unlawful, class-based discrimination are prime examples." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) (citations omitted). "Class actions under Rule 23(b)(2) are proper if injunctive or declaratory relief would be appropriate for the entire class." *Duprey v. Conn. Dep't of Motor Vehicles*, 191 F.R.D. 329, 338 (D.Conn.2000) (citing 5 *Moore's Federal Practice* 3d § 23.42[1][a] ). Here, the court finds that "the plaintiffs satisfy the requirements of Rule 23(b)(2) because the plaintiffs seek injunctive relief and they predicate the lawsuit on the defendants' acts and omissions with respect to" injecting drug users in Bridgeport. *Comer v. Cisneros*, 37 F.3d 775, 796 (2d Cir.1994). The plaintiffs' claims are predicated on the actions of the defendants in stopping and arresting injecting drug users for possession of injection equipment and trace amounts of drugs contained therein as residue, and the defendants admit that these arrests will continue insofar as the defendants "contend that individuals who do not demonstrate with identification that they are registered active participants in the [Exchange] do not receive the immunity from arrest in accordance with C.G.S. Section 21a–267 *et seq.* for possession of drug paraphernalia with residue." Memo. of Law of Defendants (Dkt. No. 23) at 4–5. As such, the court concludes that Rule 23(b)(2) treatment is appropriate is this case.

**F. Conclusion**

The court concludes that certification of a class of all injecting drug users, present and future, in Bridgeport is appropriate in this case under Rule 23(b)(2).[6] The court

---

**6.** Ordinarily, upon certification of a class, notice would be required to class members. However, "[i]n a class action under Rule 23(b)(2), the

Court, in its discretion, may dispense with the normal requirement of prior notice to absent class members." *Beauchesne v. Nimmo*, 562

therefore grants Plaintiffs' Motion for Class Certification [Dkt. No. 24], and this case is certified as a class action for a class of all injecting drug users, present and future, in Bridgeport.

## III. REQUEST FOR PERMANENT INJUNCTION

The plaintiff class seeks to permanently enjoin the defendants from searching, stopping, arresting or punishing any person based solely upon that person's possession of less than thirty-one hypodermic syringes or needles, whether sterile or previously-used and whether empty or containing trace amounts of narcotic substances as residue. "The Defendants have conceded, for purposes of this action, that an individual who is part of the [Exchange] would be exempt from arrest if all that they had at the time of a police stop was the needles to be exchanged, which needles contained residue only." Memo. of Law of Defendants (Dkt. No. 23) at 11 n. 1. "Defendants agree that the intent of the Connecticut General Statutes § 19a–124, which encourages a return of needles to the [Exchange], would be thwarted with any other interpretation." *Id.* However, the defendants argue that "this same analysis does not apply to persons not in the [Exchange] program who have hypodermic needles and syringes with residue or narcotic substance." *Id.* at 6. As such, the defendants argue, enjoining the defendants from searching, stopping, arresting, punishing or penalizing in any way, or threatening to search, stop, arrest, punish or penalize in any way, non-exchange-program-participants requires an interpretation of the Connecticut needle and syringe exchange program and criminal drug enforcement statutes that "was never intended by the legislature in enacting § 21a–240(20)(A)(ix) and Connecticut General Statutes § 19a–124," and "such an interpretation would frustrate the enforcement of drug violations and encourage the spread of drug use by society." [7] *Id.*

The defendants thus concede that it is legal in Connecticut for any injecting drug user to possess less than thirty-one sterile hypodermic syringes and needles and for Exchange participants to possess less than thirty-one previously-used hypodermic syringes and needles, including any trace amounts of narcotic substances contained therein as residue. The primary issue facing the court, therefore, is whether it is legal for any injecting drug user, whether a participant in the Exchange or not, to possess not only previously-used hypodermic syringes and needles in quantities less than thirty-one, but also to possess any trace amounts of narcotic substances contained therein as residue.

### A. Permanent injunction standard

It is well-established that "to obtain a permanent injunction a party must show the absence of an adequate remedy at law and irreparable harm if the relief is not granted." *N.Y. State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1362 (2d Cir.1989) (citation omitted). To obtain a permanent injunction, moreover, the plaintiffs must actually succeed on the merits and cannot rest, as they may when seeking a preliminary injunction, on a mere showing of a likelihood of success. *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 546 n. 12, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987). To satisfy the irreparable harm requirement, "[a] moving party must show that the injury it will suffer is likely and imminent, not remote or speculative, and that such injury is not capable of being fully remedied by money damages." *NAACP v. Town of E. Haven*, 70 F.3d 219,

---

F.Supp. 250, 259 (D.Conn.1983) (citing, *inter alia, Eisen*, 417 U.S. at 177, 94 S.Ct. 2140). Here, "[t]he plaintiff[s are] represented by skilled and experienced counsel and prior notice to the class would serve no apparent purpose." *Id.* (citation omitted). As such, exercising its discretion, the court will not require any notice be sent to class members in this case.

7. The defendants also argue that the court should make a finding that they have qualified immunity

from the plaintiffs' claims and "that any past actions [by the defendants] are immune from liability." Memo. of Law of Defendants (Dkt. No. 23) at 10; *see also id.* at 10–15. This argument is inapposite because the plaintiff class seeks only injunctive and declaratory relief. Qualified immunity will not shield government defendants from suits for equitable relief, such as the plaintiffs' instant suit. *Adler v. Pataki*, 185 F.3d 35, 48 (2d Cir.1999).

224 (2d Cir.1995) (citations omitted). "The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Jayaraj v. Scappini*, 66 F.3d 36, 39 (2d Cir.1995) (citation and internal quotation marks omitted). The Second Circuit has noted, however, that, "[a]lthough a showing of 'irreparable harm' is required for the imposition of any injunctive relief, preliminary or permanent, ... the 'imminent' aspect of the [irreparable] harm [requirement] is not crucial to granting a permanent injunction." *Rodriguez v. DeBuono*, 175 F.3d 227, 235 n. 9 (2d Cir.1999) (citations omitted). The plaintiffs must therefore establish three elements: 1) that, absent injunctive relief, they will suffer irreparable harm, 2) that they have no adequate remedy at law, and 3) actual success on the merits.

### B. Irreparable harm and lack of an adequate remedy at law

The plaintiffs allege violations of their fourth amendment rights to be free from illegal search and seizures, false arrest, and malicious prosecution. Dkt. No. 1 at ¶¶ 49–56. The law is well-settled that plaintiffs establish irreparable harm through "the allegation of fourth amendment violations." *Brewer v. W. Irondequoit Cent. Sch. Dist.*, 212 F.3d 738, 744 (2d Cir.2000) (citing *Covino v. Patrissi*, 967 F.2d 73, 77 (2d Cir.1992)). Both individual plaintiffs have already been detained and charged with possession of narcotics for the alleged residual quantities of drugs contained in previously-used needles they were carrying, such that the threat to their fourth amendment rights is actual and imminent and not remote or speculative. Based on the record, the court finds that the plaintiffs have alleged systemic or ongoing constitutional violations that can not be remedied with a monetary award. *See Air Transp. Int'l, L.L.C. v. Aerolease Fin. Group, Inc.*, 993 F.Supp. 118, 124–25 (D.Conn.1998); *see also N.Y. State Nat'l Org. for Women*, 886 F.2d at 1362 ("The irreparable harm flowing from defendants' activities—including the medical risks and the denial of constitutionally guaranteed rights—is real and threatens to continue."). The court

therefore concludes that "the plaintiffs have met their burden of showing irreparable harm because the deprivation alleged involves a constitutional right." *Brewer*, 212 F.3d at 745.

### C. Actual success on the merits

In order to prevail on their request for a permanent injunction, the plaintiff class must actually succeed on the merits of the fourth amendment claims alleged against the defendants. The plaintiff class alleges that the class members' fourth amendment rights have been and are in imminent danger of being violated by false arrests perpetrated by the defendants. Initially, the court notes that, "[t]he right not to be arrested or prosecuted without probable cause has, of course, long been a clearly established constitutional right. Probable cause to arrest exists when the authorities have knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir.1991) (citation omitted). Thus, "[t]o prevail on a claim of false arrest in violation of the Fourth Amendment, a plaintiff must establish that the arresting officers did not have probable cause for the arrest." *Lieberman v. Dudley*, No. 3:95–cv–2437 (AHN), 1998 WL 740827, at *2 n. 1 (D.Conn. July 27, 1998); *see also Beinhorn v. Saraceno*, 23 Conn.App. 487, 490–91, 582 A.2d 208 (1990) ("The trial court instructed the jury that the plaintiff had the burden of proving a lack of probable cause for her arrest in order to establish her allegation of false arrest.... Thus, in order to prevail on her complaint, the plaintiff had the burden of proving that the arresting officer did not have probable cause to arrest her."). Under Connecticut law, a lawful arrest may be made with an arrest warrant or when an individual is "apprehended in the act or upon the speedy information of others," though "[t]here must still be probable cause." *Presnick v. Delaney*, 110 F.Supp.2d 74, 80–81 (D.Conn.1999) (citing Conn. Gen.Stat. § 54–1f(a); *State v. Santiago*, 224 Conn. 494, 498, 619 A.2d 1132 (1993)).

■ According to the Second Circuit, "the Fourth Amendment provides the source for a § 1983 claim premised on a person's arrest." *Singer v. Fulton County Sheriff,* 63 F.3d 110, 115 (2d Cir.1995) (footnote omitted). "The Fourth Amendment, of course, does not by its terms proscribe false arrests; it proscribes 'unreasonable ... seizures.' An arrest, however, is a seizure, indeed it is the 'quintessential' seizure of the person." *Posr v. Doherty,* 944 F.2d 91, 97 (2d Cir.1991) (quoting *Cal. v. Hodari D.,* 499 U.S. 621, 624, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991)).

The plaintiffs' claims turn primarily upon allegedly illegal stops and arrests of injecting drug users for possession of less than thirty-one hypodermic syringes and needles. The injunctive relief that the plaintiff class seeks is the same for all of its fourth amendment claims. Consequently, the court limits its analysis to the plaintiffs' false arrest claim.

The plaintiffs argue that it is not a crime under Connecticut law for anyone to possess less than thirty-one sterile or previously-used hypodermic syringes and needles and any trace amounts of narcotic substances contained therein as residue. If such possession is not an offense, the defendants cannot have probable cause to arrest the plaintiff class members for such possession, and the plaintiff class will have succeeded on its fourth amendment false arrest claims under section 1983. The resolution of this issue requires the court to engage in statutory interpretation to determine whether possession by any injecting drug user of previously-used hypodermic syringes and needles and of trace amounts of drugs contained as residue within previously-used syringes or needles constitutes illegal possession of drug paraphernalia or controlled substances under Connecticut law, particularly Conn. Gen.Stat. §§ 21a–267 & 21a–279(a), respectively.

**D. Interpretation of the Connecticut needle and syringe exchange program and criminal drug enforcement statutes**

**1. Relevant statutory enactments**

In order to interpret the pertinent Connecticut statutes, the court must first lay out,

chronologically, the relevant legislative enactments which preceded the current versions of sections 21a–267 and 21a–279(a). In 1990, the legislature enacted P.A. No. 90–214. That Public Act mandated the establishment of an experimental needle and syringe exchange program in New Haven, which was required to, *inter alia,* "provide that program participants receive an equal number of needles and syringes for those returned, up to a cap of [five] needles and syringes per exchange." This enactment also added the following language to Conn. Gen.Stat. § 21a–65(a): "A licensed manufacturer or licensed wholesaler may sell hypodermic needles and syringes without the prescription of a practitioner, as defined in section 20–184a, only to the following: ... *and (7) to the needle and syringe exchange program established pursuant to section 3 of this act.*" (emphasis on amended text). The 1990 enactment also added the following exception to the criminal prohibition on the possession of drug paraphernalia in Conn. Gen.Stat. § 21a–267: "(d) The provisions of subsections (a) and (b) of this section shall not apply to the possession or delivery of needles and syringes as part of the demonstration needle and syringe exchange program established pursuant to section 3 of this act."

The 1990 enactment left the definition of "drug paraphernalia" unchanged as "hypodermic syringes, needles and other objects used, intended for use or designed for use in parenterally injecting controlled substances into the human body." Conn. Gen.Stat. § 21a–240(20)(A)(9) (1985). It also did not change the general prohibition on the possession of drug paraphernalia: "No person shall use or possess with intent to use drug paraphernalia, as defined in subdivision (20) of section 21a–240, to ... inject, ingest, inhale or otherwise to ... inject, ingest, inhale or otherwise introduce into the human body, any controlled substance as defined in subdivision (9) of section 21a–240." Conn. Gen. Stat. § 21a–267(a).

In 1992, the legislature enacted P.A. No. 92–185. In this enactment, the legislature changed the language of Conn. Gen.Stat. § 21a–65(a) to: "(a) A licensed manufacturer or licensed wholesaler may sell hypodermic

needles and syringes [without the prescription of a practitioner, as defined in section 20–184a,] only to the following: ... (7) to [the] *a* needle and syringe exchange program established pursuant to section 19a–124." (emphasis on amended language and deleted language in brackets). The legislature also added language to section 21a–65(b):

(b) Except as provided in subsection (a) of this section, no licensed manufacturer, licensed wholesaler or licensed pharmacist shall sell and no person shall buy a hypodermic needle or syringe except upon a prescription of a practitioner, as defined in section 20–184a, *in a quantity greater than eight.... Hypodermic needles and syringes in a quantity of eight or less without a prescription may be provided or sold at retail only by the following: (1) By a pharmacy licensed in accordance with section 20–168 and in such pharmacy only by a licensed pharmacist or under his direct supervision; (2) by a needle exchange program established pursuant to section 19a–124; and (3) by a health care facility or a licensed health care practitioner for use by their own patients.*

(emphasis on amended language).

Additionally, in P.A. No. 92–185, the legislature repealed entirely the exception added in 1990 to the prohibition on drug paraphernalia in Conn. Gen.Stat. § 21a–267(d).[8] *See supra* at 28. At the same time, section 2 of this 1992 enactment changed the definition of "drug paraphernalia" in Conn. Gen.Stat. § 21a–240(20)(A)(9)[9] to *"(ix) in a quantity greater than eight,* hypodermic syringes, needles and other objects used, intended for use or designed for use in parenterally injecting controlled substances into the human body." (emphasis on amended language). Correspondingly, the legislature amended section 21a–267(a) to read: "No person shall use or possess with intent to use drug paraphernalia, as defined in subdivision (20) of section 21a–240, *as amended by section 2 of this act,* to ... inject, ingest, inhale or otherwise introduce into the human body, any controlled substance as defined in subdivision (9) of

section 21a–240." (emphasis on amended language).

The legislature then, in a May 1992 Special Session, enacted P.A. No. 92–3. That Public Act amended section 19a–124 to expand the needle and syringe exchange program to Bridgeport and Hartford. It also required these programs to, *inter alia,* "provide that program participants receive an equal number of needles and syringes for those returned, up to a cap of [five] needles and syringes per exchange." This 1992 enactment also amended Conn. Gen.Stat. § 19a–124(b) to provide, *inter alia,* that, "for the first year of operation of the" needle and syringe exchange programs established under section 19a–124(a), "all needles and syringes shall be marked and checked for return rates."

Finally, in the May 1992 Special Session, the legislature passed P.A. No. 92–11, which enacted the following changes to section 21a–65(b):

Hypodermic needles and syringes in a quantity of [eight] *ten* or less without a prescription may be provided or sold at retail only by the following: (1) By a pharmacy licensed in accordance with section 20–168 and in such pharmacy only by a licensed pharmacist or under his direct supervision; (2) by a needle exchange program established pursuant to section 19a–124; and (3) by a health care facility or a licensed health care practitioner for use by their own patients.

(emphasis on amended language and deleted language in brackets). Additionally, the legislature changed the definition of "drug paraphernalia" in Conn. Gen.Stat. § 21a–240(20)(A)(ix) to "in a quantity greater than [eight] *ten* hypodermic syringes, needles and other objects used, intended for use or designed for use in parenterally injecting controlled substances into the human body." (emphasis on amended language and deleted language in brackets).

In 1994, the legislature enacted P.A. No. 94–16, which amended the language of Conn.

---

**8.** P.A. No. 92–185, however, made no changes to the language of Conn. Gen.Stat. § 19a–124, the needle and syringe exchange program statute.

**9.** This amendment also renumbered the statute as Conn. Gen.Stat. § 21a–240(20)(A)(ix).

Gen.Stat. § 19a–124(b)(2) to read: "provide for free and anonymous exchanges of needles and syringes and provide that program participants receive an equal number of needles and syringes for those returned, up to a cap of [five] *ten* syringes per exchange." (emphasis on amended language and deleted language in brackets). Five years later, in 1999, the legislature passed P.A. No. 99–2, which amended section 19a–124(b)(2) as follows: "(2) provide for free and anonymous exchanges of needles and syringes and [ (A) ] provide that program participants receive an equal number of needles and syringes for those returned, up to a cap of [ten] *thirty needles and* syringes per exchange, *(B) provide that first-time applicants to the program receive an initial packet of thirty needles and syringes, educational material and a list of drug counseling services; and (C) assure, through program-developed and commissioner-approved protocols, that a person receive only one such initial packet over the life of the program.*" (emphasis on amended language and deleted language in brackets). P.A. No. 99–2 also changed the definition of "drug paraphernalia" in section 21a–240(20)(A)(ix) to "in a quantity greater than [ten] *thirty* hypodermic syringes, needles and other objects used, intended for use or designed for use in parenterally injecting controlled substances into the human body." [10]

Two other statutes are relevant to the court's analysis: Conn. Gen.Stat. §§ 21a–270 & 21a–279(a). Since 1983, Conn. Gen.Stat. § 279(a) has criminalized the possession of "any quantity of any narcotic substance." [11] Conn. Gen.Stat. § 21a–270, since 1983, has provided, in pertinent part:

> In determining whether any object or material listed in subdivision (20) of section 21a–240 shall be deemed "drug paraphernalia", a court or other authority shall, in

addition to all other logically relevant factors, consider the following:

> . . .

> (3) The existence of any residue of controlled substances on the object . . . .

None of the enactments between 1990 and 1999 discussed above expressly altered the language of either section 21a–279(a) or section 21a–270(3).

## 2. Principles of statutory interpretation under Connecticut law

■ A district court interpreting a state statute must "predict how the forum state's highest court would decide the issues before [it], . . ., and, to the extent there is any ambiguity in the state statutes under consideration, to carefully predict how the highest court of the state would resolve the uncertainty or ambiguity." *Sprint PCS L.P. v. Conn. Siting Council*, 222 F.3d 113, 115–16 (2d Cir.2000) (citations and internal quotation marks omitted). Thus, this court will first turn to the principles of statutory interpretation utilized by the Connecticut Supreme Court when interpreting Connecticut state statutes.

The Connecticut Supreme Court has held that, " '[i]n construing statutes, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature.' " *State v. Gibbs*, 254 Conn. 578, 601, 758 A.2d 327 (2000) (citations omitted).

> In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of this case, including the question of whether the language actually does apply. In seeking to determine that meaning, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy

**10.** P.A. No. 99–2 did not, however, correspondingly raise from ten to thirty the number of "[h]ypodermic needles and syringes" that can be provided or sold by pharmacists without a prescription under Conn. Gen.Stat. § 21a–65(b).

**11.** Conn. Gen.Stat. § 21a–279(a) currently provides in full:
   (a) Any person who possesses or has under his control any quantity of any narcotic substance, except as authorized in this chapter, for a first offense, may be imprisoned not more than

seven years or be fined not more than fifty thousand dollars, or be both fined and imprisoned; and for a second offense, may be imprisoned not more than fifteen years or be fined not more than one hundred thousand dollars, or be both fined and imprisoned; and for any subsequent offense, may be imprisoned not more than twenty-five years or be fined not more than two hundred fifty thousand dollars, or be both fined and imprisoned.

it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter. . . .

*Willoughby v. City of New Haven*, 254 Conn. 404, 410, 757 A.2d 1083 (2000) (citations omitted).

The Connecticut Supreme Court, however, "will not ordinarily construe a statute whose meaning is plain and unambiguous." *City of W. Haven v. Hartford Ins. Co.*, 221 Conn. 149, 156, 602 A.2d 988 (1992) (citations omitted). This is because, "[o]rdinarily, 'when the language of a statute is plain and unambiguous, we need look no further than the words themselves because we assume that the language expresses the legislature's intent." *Conn. Light & Power Co. v. Tex.-Ohio Power, Inc.*, 243 Conn. 635, 656, 708 A.2d 202 (1998) (citations omitted). "In the absence of ambiguity, the intent of the legislature is to be found not in what it meant to say but in what it did say." *Furstein v. Hill*, 218 Conn. 610, 622, 590 A.2d 939 (1991) (citations omitted). "Where there is ambiguity in the statute, however, we ascertain the actual intent by looking to the language of the statute itself, its legislative history, the circumstances surrounding its enactment and its purpose." *Winchester Woods Assocs. v. Planning & Zoning Comm'n*, 219 Conn. 303, 310, 592 A.2d 953 (1991) (citations omitted).

The Connecticut Supreme Court therefore looks "first to the language of the statute . . . which must be read in the context of the underlying statutory scheme." *Fyber Props. Killingworth Ltd. P'ship v. Shanoff*, 228 Conn. 476, 482, 636 A.2d 834 (1994) (citations omitted). "The words of a statute are to be given their commonly approved meaning unless a contrary intent is clearly expressed," *Oxford Tire Supply, Inc. v. Comm'r of Revenue Servs.*, 253 Conn. 683, 696, 755 A.2d 850 (2000) (citation and internal quotation marks omitted), or "the context indicates that a different meaning was intended," *Stamford Ridgeway Assocs. v. Bd. of Representatives*, 214 Conn. 407, 425, 572 A.2d 951 (1990) (citation and internal quotation marks omitted). Conn. Gen.Stat. § 1–1(a) specifically provides that, "[i]n the construction of the statutes, words and phrases shall be construed according to the commonly approved usage of the language; and technical words and phrases, and such as have acquired a peculiar and appropriate meaning in the law, shall be construed and understood accordingly." Additionally, the Connecticut Supreme Court will "consider the statute as a whole with a view toward reconciling its parts in order to obtain a sensible and rational overall interpretation." *Fruin v. Colonnade One at Old Greenwich Ltd. P'ship*, 237 Conn. 123, 130, 676 A.2d 369 (1996) (citation and internal quotation marks omitted). " '[S]uch . . . reconciliation is especially important in dealing with provisions that are enacted as part of the same legislation.' " *Elliot v. Sears, Roebuck & Co.*, 229 Conn. 500, 512, 642 A.2d 709 (1994) (citation omitted).

The Connecticut Supreme Court has further held that "[t]he rule that unambiguous language requires only strict application to the facts and prohibits resort to other aids to interpretation only applies, however, where the language is absolutely clear and unambiguous; . . . and where no inherent ambiguity is disclosed by reference to the facts of the case." *State v. Cain*, 223 Conn. 731, 744, 613 A.2d 804 (1992) (citation omitted). Thus, "[a]lthough we must first look to the language of the statute to determine legislative intent, if the meaning is not evident, we may employ additional sources of statutory construction." *Pollio v. Planning Comm'n*, 232 Conn. 44, 50, 652 A.2d 1026 (1995) (citation omitted). Thus, by well-settled precedent, if the "plain language" of a statute and the application of so-called "intrinsic aids" to statutory interpretation do not resolve the issue, the Connecticut Supreme Court then turns to an examination of the statute's legislative history, the circumstances surrounding its enactment, and its purpose. *See Alvarez v. New Haven Register, Inc.*, 249 Conn. 709, 716–18, 735 A.2d 306 (1999); *Fruin*, 237 Conn. at 130, 676 A.2d 369. " 'These [intrinsic] aids to legislative interpretation apply with equal force to amendatory acts which effectuate changes in existing statutes.' " *Rose v. Freedom of Info. Comm'n*, 221 Conn. 217, 227, 602 A.2d 1019 (1992) (citation omitted).

"Furthermore, even if a statute is considered clear on its face, if a literal interpretation of that statute would lead to unworkable results, resort to other aids to determine legislative intent is appropriate." *Cain*, 223 Conn. at 744, 613 A.2d 804 (citation and footnote omitted). Among these other aids, courts may examine the relevant legislative history and the statute's relationship to existing legislation, particularly existing statutes regarding the same general subject matter. *See State v. Velasco*, 253 Conn. 210, 221 (2000); *Burke v. Fleet National Bank*, 252 Conn. 1, 21, 742 A.2d 293 (1999). In this context, the Connecticut Supreme Court has observed that "[s]tatements of legislators often provide strong indication of legislative intent." *Lynn v. Haybuster Mfg., Inc.*, 226 Conn. 282, 292, 627 A.2d 1288 (1993) (citation omitted). Thus, "[s]tatements of purpose, committee reports, and floor debate are all legitimate sources of legislative intent." *Burge v. Town of Stonington*, 219 Conn. 581, 594, 594 A.2d 945 (1991) (citations omitted).

In practice, the statement of these general principles, however, must give way to the difficult and often complex task of applying various specific and sometimes conflicting canons of statutory construction adopted by the Connecticut Supreme Court. In particular, the court observes that determining the intent of the legislature in its various enactments since 1990 relating to the needle and syringe exchange programs and drug enforcement statutes arguably requires the court to address two competing general principles of statutory interpretation: principles counseling that exceptions and implied repeals be strictly limited and principles requiring that statutes be read so as to make each statute and each section therein meaningful to avoid absurd results.

Several well-established canons adopted by the Connecticut Supreme Court counsel that courts must be wary to read exceptions and repeals into statutes beyond the statute's express language. " 'Courts may not by construction supply omissions ... or add exceptions merely because it appears that good reasons exist for adding them.' " *Leo Fedus & Sons Constr. Co., Inc.*

*v. Zoning Bd. of Appeals*, 225 Conn. 432, 441, 623 A.2d 1007 (1993) (citations omitted).

Furthermore, where the legislature "could easily have" included express language to accomplish a particular result, courts "are not permitted to supply statutory language that the legislature may have chosen to omit." *Vaillancourt v. New Britain Machine/Litton*, 224 Conn. 382, 396, 618 A.2d 1340 (1993) (citation and footnote omitted); *see also Lynn*, 226 Conn. at 290, 627 A.2d 1288 ("Certainly, the legislature is capable of providing explicit limitations when that is its intent." (citation omitted)). Particularly where the legislature has provided a similar exception or provision by express terms in another statute, "[a]bsent such language by the legislature, this court cannot engraft amendments into the statutory language." *Red Hill Coalition, Inc. v. Town Plan & Zoning Comm'n*, 212 Conn. 727, 736, 563 A.2d 1347 (1989) (citations and internal quotation marks omitted).

Moreover, "it is a well established rule of statutory construction that repeal of the provisions of a statute by implication is not favored and will not be presumed where the old and the new statutes ... can peacefully coexist.... If, by any fair interpretation, we can find a reasonable field of operation for both [statutes], without destroying or perverting their meaning and intent, it is our duty to reconcile them and give them concurrent effect...." *Rivera v. Comm'r of Corr.*, 254 Conn. 214, 242, 756 A.2d 1264 (2000) (citation and internal quotation marks omitted). "Nevertheless, it is a well established principle of statutory construction that subsequent enactments of the legislature are presumed to repeal earlier inconsistent ones to the extent that they are in conflict." *Metro. Dist. v. Town of Barkhamsted*, 199 Conn. 294, 305, 507 A.2d 92 (1986) (citation omitted); *see also State v. Tyson*, 195 Conn. 326, 331, 487 A.2d 1091 (1985) (" 'When expressions of the legislative will are irreconcilable, the latest prevails.' " (citation omitted)). "Because repeal by implication is generally disfavored, however, the principle applies only when the relevant statutes 'cannot stand together.' " *Dugas v.*

*Lumbermens Mut. Cas. Co.*, 217 Conn. 631, 641, 587 A.2d 415 (1991) (citations omitted).

Additionally, " '[i]n the interpretation of a statute, a radical departure from an established policy cannot be implied. It must be expressed in unequivocal .language.' " *Rivera*, 254 Conn. at 242, 756 A.2d 1264 (citation omitted). " 'Furthermore, there is a presumption that an amendatory act does not change the existing law further than is expressly declared or necessarily implied.' " *Id.* (citation and footnote omitted).

Various other well-established canons of Connecticut statutory interpretation, however, are somewhat in tension in this case with the principles just enumerated. It is well-settled that, "[w]hen construing a statute, we do not interpret some clauses in a manner that nullifies others, but rather read the statute as a whole and so as to reconcile all parts as far as possible." *City of W. Haven*, 221 Conn. at 157, 602 A.2d 988 (citations and internal quotation marks omitted). The Connecticut Supreme Court has further held that "[i]t is a basic tenet of statutory construction that the legislature did not intend to enact meaningless provisions." *Willoughby*, 254 Conn. at 422, 757 A.2d 1083 (citation and internal quotation marks omitted). "Accordingly, care must be taken to effectuate all provisions of the statute." *Gibbs*, 254 Conn. at 602, 758 A.2d 327 (citation and internal quotation marks omitted).

"In addition, we presume that the legislature intends sensible results from the statutes it enacts.... Therefore, we read each statute in a manner that will not thwart its intended purpose or lead to absurd results...." *Town of Southington v. Commercial Union Ins. Co.*, 254 Conn. 348, 357–58, 757 A.2d 549 (2000) (citations and internal quotation marks omitted). Thus, "[i]n construing a statute, common sense must be used and courts will assume that [the legislature intended to accomplish] a reasonable and rational result...." *Caltabiano v. Planning & Zoning Comm'n*, 211 Conn. 662, 666, 560 A.2d 975 (1989) (citation and internal quotation marks omitted). "The unreasonableness of the result obtained by the acceptance of one possible alternative interpreta-

tion of an act is a reason for rejecting that interpretation in favor of another which would provide a result that is reasonable." *Sweetman v. State Elections Enforcement Comm'n*, 249 Conn. 296, 307, 732 A.2d 144 (1999) (citations and internal quotation marks omitted).

Accordingly, the Connecticut Supreme Court has held that "[w]e consider the statute as a whole with a view toward reconciling its parts in order to obtain a sensible and rational overall interpretation." *Id.* (citations and internal quotation marks omitted). "We have long followed the guideline that [t]he intent of the lawmakers is the soul of the statute, and the search for this intent we have held to be the guiding star of the court. It must prevail over the literal sense and the precise letter of the language of the statute." *Id.* (citations and internal quotation marks omitted).

The Connecticut Supreme Court has also held that "[w]e presume that, in enacting a statute, the legislature intended a change in the existing law," although "[t]his presumption, like any other, may be rebutted by contrary evidence of the legislative intent in the particular case." *Conn. Nat'l Bank v. Giacomi*, 242 Conn. 17, 39, 699 A.2d 101 (1997) (citations and internal quotation marks omitted). This follows because the legislature is presumed to know all the existing statutes, the judicial interpretation of them, and the effect that its action or nonaction will have on them. *Dodd v. Middlesex Mut. Assurance Co.*, 242 Conn. 375, 386, 698 A.2d 859 (1997); *see also In re Valerie D.*, 223 Conn. 492, 524, 613 A.2d 748 (1992) ("Furthermore, the legislature in enacting statutes is presumed to be aware of the existence of other legislation on the same or related issues; ... and '[s]tatutes are to be interpreted with regard to other relevant statutes because the legislature is presumed to have created a consistent body of law.' " (citations omitted)). "And it is always presumed to have intended that effect which its action or non-action produces." *Civardi v. City of Norwich*, 231 Conn. 287, 298, 649 A.2d 523 (1994) (citation and internal quotation marks omitted).

### 3. Interpretation of the Connecticut needle and syringe exchange program and criminal drug enforcement statutes

■ Applying these principles, the court must determine whether the possession by any injecting drug user of sterile or previously-used hypodermic syringes and needles, or the possession of trace amounts of drugs contained as residue within previously-used syringes or needles, constitutes illegal activity under Connecticut law. The court notes initially that hypodermic syringes and needles are potentially criminalized only as illegal "drug paraphernalia" under section 21a–267(a). The term "drug paraphernalia" used in section 21a–267(a) is explicitly defined in section 21a–240(20)(A)(ix) to include "hypodermic syringes, [and] needles," in quantities greater than thirty. Conn. Gen.Stat. § 21a–270(3) instructs courts to consider "[t]he existence of any residue of controlled substances on [any object or material listed in subdivision (20) of section 21a–240]," such as a hypodermic syringe or needle, "[i]n determining whether … [it] shall be deemed 'drug paraphernalia.'"

On the other hand, simple possession of trace amounts of narcotic substances contained as residue within previously-used hypodermic syringes and needles are potentially criminalized under section 21a–279(a). That statute provides criminal liability for "[a]ny person who possesses or has under his control any quantity of any narcotic substance, except as authorized in this chapter.…" Conn. Gen.Stat. § 21a–279(a). Conn. Gen.Stat. § 21a–240(30) provides the definition of "narcotic substance."[12] Thus, section 21a–279(a) may provide criminal liability for possession of residual amounts of narcotic substances in previously-used hypodermic syringes and needles, but not for the injection equipment itself.

#### a. No criminal liability for possession of less than thirty-one sterile hypodermic syringes and needles

Reading the statutes discussed above as a whole, the court finds that the plain language and meaning of Conn. Gen.Stat. § 240(20)(A)(ix) clearly excludes from criminal liability the possession, without more, of thirty or less sterile "hypodermic syringes, needles and other objects … intended for use or designed for use in parenterally injecting controlled substances into the human body" by any person. Therefore, the court concludes, and the defendants do not dispute, that the defendants would violate the plaintiffs' fourth amendment rights by arresting the plaintiff class members solely for the possession of less than thirty-one sterile hypodermic syringes or needles.

#### b. No criminal liability for possession of less than thirty-one previously-used hypodermic syringes and needles

The court further concludes that the 1992 enactments exclude any injecting drug user from criminal liability under section 21a–267(a) for possession of previously-used hypodermic syringes and needles. The court adheres to its prior conclusion that section 21a–240(20)(A)(ix) excludes from criminal liability the possession by an Exchange participant of less than thirty-one previously-used

---

**12.** Conn. Gen.Stat. § 21a–240(30) provides in full:

"Narcotic substance" means any of the following, whether produced directly or indirectly by extraction from substances of vegetable origin, or independently by means of chemical synthesis, or by a combination of extraction and chemical synthesis: (A) Morphine-type: (i) Opium and opiate, and any salt, compound, derivative, or preparation of opium or opiate which are similar thereto in chemical structure or which are similar thereto in physiological effect and which show a like potential for abuse, which are controlled substances under this chapter unless modified; (ii) any salt, compound, isomer, derivative, or preparation thereof which is chemically equivalent or identical with any of the substances referred to in clause (i), but not including the isoquinoline alkaloids of opium; (iii) opium poppy and poppy straw; (B) cocaine-type, coca leaves and any salt, compound, derivative or preparation of coca leaves, and any salt, compound, isomer, derivatives or preparation thereof which is chemically equivalent or identical with any of these substances or which are similar thereto in physiological effect and which show a like potential for abuse, but not including decocainized coca leaves or extractions of coca leaves which do not contain cocaine or ecgonine.…

hypodermic syringes or needles themselves under section 21a–267(a), leaving to one side for the moment the issue of liability for the possession of any residue contained therein.[13] *See* Ruling on Plaintiffs' Application for Temporary Restraining Order (Dkt. No. 18) at 20–22. However, the court expands its conclusion in its prior Ruling on the basis of a fuller record and briefing, including a more complete history of the relevant legislation.

The amendments of sections 21a–240(20)(A) and 21a–267 in 1990 and 1992, read in unison, provide persuasive evidence that the legislature had a different intention for its 1992 enactments than it had for its 1990 enactment. In 1990, section 21a–267 was amended to explicitly add subsection 21a–267(d), which expressly excluded "the possession or delivery of needles and syringes as part of the demonstration needle and syringe exchange program established" from the criminal liability established under sections 21a–267(a) & 21a–267(b). In 1992, however, the legislature in P.A. No. 92–185 repealed section 21a–267(d) and added language to section 21a–240(20)(A)(ix) to exclude eight or less "hypodermic syringes, needles and other objects used, intended for use or designed for use in parenterally injecting controlled substances into the human body" from the definition of the "drug paraphernalia" possession of which is criminalized by section 21a–267(a).

The court concludes that the plain language of the 1992 amendatory enactment decriminalized the possession by any injecting drug user of less than a specified quantity of "hypodermic syringes, needles and other objects used . . . in parenterally injecting controlled substances into the human body." In so doing, the court adheres to its interpretation in its prior Ruling that the phrase "used, intended for use or designed for use in parenterally injecting controlled substances into the human body" explicitly applies only to "other objects" and not the terms "hypodermic syringes, needles" in section 21a–240(20)(A)(ix). *See* Ruling on Plaintiffs' Application for Temporary Restraining Order (Dkt. No. 18) at 20–21. However, under the

doctrine of *ejusdem generis,* the general phrase "other objects" must be " 'construed to embrace things of the same general kind or character as those specifically enumerated,' " *i.e.,* "hypodermic syringes" and "hypodermic . . . needles." *Paige v. Town Plan & Zoning Comm'n,* 235 Conn. 448, 457, 668 A.2d 340 (1995) (citation omitted). This doctrine also dictates that "hypodermic syringes" and "hypodermic . . . needles" must be understood themselves to be objects that are "used, intended for use or designed for use in parenterally injecting controlled substances into the human body." The court also notes that section 21a–270(3) calls for courts to consider "[t]he existence of any residue of controlled substances on" injection equipment in determining whether it is illegal "drug paraphernalia" under section 21a–240(20)(A).

The defendants have conceded that Exchange participants are exempt from liability under section 21a–267 for possession of specified quantities of previously-used hypodermic syringes and needles, for the reasons laid out in the court's prior Ruling, but the defendants argue that possession by non-exchange-program-participants is not exempt. *See* Memo. of Law of Defendants (Dkt. No. 23) at 5–6 & 11 n. 1. However, the court notes that the legislature knew how to limit an exception from section 21a–267(a) liability to participants in the New Haven needle and syringe exchange program and clearly did so in former section 21a–267(d). In 1992, when the legislature repealed section 21a–267(d) and amended section 21a–240(20)(A)(ix), the legislature could have instead simply left the limited exception of section 21a–267(d) in place or added to section 21a–240(20)(A)(ix) language similar to that in section 21a–267(d). The legislature chose not to do so, although these changes to sections 21a–267(d) and 21a–240(20)(A)(ix) were made within the same 1992 enactment. *See Elliot,* 229 Conn. at 512, 642 A.2d 709. "To ignore the intent behind such an amendment would, in effect, contradict our presumption 'that there is a purpose behind every sentence, clause, or phrase used in an act and that no

---

**13.** The defendants do not dispute the court's earlier conclusion that possession of such used

syringes and needles by Exchange participants is not a crime under Connecticut law.

part of a statute is superfluous.'" *Frillici v. Town of Westport,* 231 Conn. 418, 432, 650 A.2d 557 (1994) (citations omitted). The court cannot supply an exception to the exclusion from liability for "used" syringes and needles under section 21a–267(a) which the legislature evidently chose to omit.

### c. No criminal liability for possession of trace amounts of narcotic substances contained as residue within less than thirty-one previously-used hypodermic syringes and needles

The court finally concludes that, with the 1992 enactments, the possession by anyone of trace amounts of narcotic substances contained as residue within less than thirty-one previously-used hypodermic syringes and needles is not criminalized under section 21a–279(a). The court finds that the plain language of the statutes, including section 21a–279(a), is largely inconclusive in reaching this conclusion. Accordingly, in reaching its conclusion, the court must undertake an examination of the relevant legislative history and the purpose behind the 1992 enactments.

Turning first to the history of the relevant statutory schemes, the court notes that the P.A. No. 92–3 expanded the needle and syringe exchange program established in New Haven in 1990 to Bridgeport and Hartford. P.A. No. 92–185, passed before P.A. No. 92–3, left intact the basic structure of the needle and syringe exchange program, but provided that less than eight (and then ten) hypodermic syringes and needles are not defined as "drug paraphernalia" and therefore are exempt from criminal liability under section 21a–267(a). The 1992 enactments also amended section 21a–65(b) to allow pharmacists to sell hypodermic syringes and needles without a prescription in quantities tracking the quantities decriminalized by the amendments to section 21a–240(20)(A)(ix).

The decriminalization of the sale of syringes and needles without a prescription is not tied to a requirement that the buyer be a participant in a needle and syringe exchange program. By enacting P.A. No. 92–185, which, *inter alia,* repealed section 21a–267(d) and amended sections 21a–240(20)(A)(ix) and 21a–65(b), the legislature expressed its intention to the contrary. Prior to the 1992 enactments, the exclusion from criminal liability under section 21a–267(a) for possession of hypodermic syringes and needles was expressly tied to participation in the New Haven needle and syringe exchange program by section 21a–267(d) and, pursuant to section 21a–65(a), pharmacists could sell hypodermic syringes and needles without prescription only to the New Haven needle and syringe exchange program. P.A. No. 92–185, however, repealed section 21a–267(d) and allowed the sale of injection equipment by pharmacists directly to injecting drug users without a prescription under section 21a–65(b).

Section 21a–65(b), as amended by P.A. Nos. 92–185 & 92–11, also does not require that the buyer in a pharmacy return previously-used syringes or needles before buying sterile ones nor that the pharmacist provide the buyer with counseling or information on drug treatment, as required under section 19a–124(b) for needle and syringe exchange programs. Indeed, the legislature considered and rejected amendments to the bill it enacted as P.A. No. 92–185 which would have added counseling and exchange requirements to the sale of hypodermic syringes and needles by pharmacists under section 21a–65(b). *See* 35 H. Proc., Pt. 16, 1992 Sess. (H–638), pp. 5285–97, 5328–33. This legislative history constitutes clear evidence that the legislature did not intend any such restrictions on the provision providing for the sale of hypodermic syringes and needles by pharmacists to injecting drug users without a prescription. *See* 2A Singer, *Sutherland Statutory Construction* (5th ed.1992) § 48:18, at 369 ("Generally the rejection of an amendment indicates that the legislature does not intend the bill to include the provisions embodied in the rejected amendment."); *cf. Dowling v. Slotnik,* 244 Conn. 781, 804–05, 712 A.2d 396 (1998) (finding that, "[i]n light of the legislature's consideration of whether aliens should be excluded from the purview of the Worker's Compensation Act, the fact that, when ultimately adopted, chapter 138 of the 1913 Public Acts did not contain a provision excluding aliens from the statutory scheme is clear evidence that the legislature intended

aliens to come within the statutory definition of an employee . . ." (citations omitted)).

The court concludes initially that the 1990 enactment, standing alone, which limited the exemption from criminal liability for possession of previously-used hypodermic syringes and needles to participants in the New Haven needle and syringe exchange program through section 21a–267(d), also necessarily exempted participants in the New Haven needle and syringe exchange program from criminal liability for possession of trace amounts of narcotic substances contained as residue within previously-used syringes or needles. A contrary interpretation would lead to an absurd and unworkable result by placing the operation of the New Haven needle and syringe exchange program under section 19a–124 in conflict with the criminal prohibitions of section 21a–279(a). *See generally Town of Southington*, 254 Conn. at 360, 757 A.2d 549 (applying the principle that "[w]e ordinarily read statutes with common sense and so as not to yield bizarre results" to conclude that "[i]t would make little sense, and would yield a bizarre result, if we read the powers of a municipality to accept a bond pursuant to § 8–25 without the concomitant implied power to call the bond according to its terms" (citing *Comm'n on Human Rights & Opportunities v. Sullivan Assocs.*, 250 Conn. 763, 777–78, 739 A.2d 238 (1999))). The New Haven needle and syringe exchange program established by the 1990 enactment mandated the exchange of used syringes and needles, *i.e.*, syringes and needles which will often necessarily contain "residue of controlled substances," for sterile needles. If the legislature did not intend to authorize the decriminalization for possession of residue under section 21a–279(a) for New Haven needle and syringe exchange program participants under the 1990 enactment, the 1990 legislation enacting section 19a–124 and adding section 21a–267(d) would have protected only persons involved in the New Haven

needle and syringe exchange program while they are leaving the New Haven syringe exchange locations with sterile needles, but not when they were transporting previously-used syringes and needles back to the New Haven syringe exchange locations. An interpretation which would have subjected participants in the New Haven needle and syringe exchange program to criminal liability for possession of trace residues of narcotics in the previously-used syringes and syringes that the participants were holding to transport to the New Haven syringe exchange locations would thwart the intended purpose of the 1990 statutory enactment establishing the New Haven exchange program, *i.e.*, to reduce the incidence and spread of HIV and other blood-borne diseases through the sharing or improper disposal of previously-used hypodermic syringes and needles.

The 1992 enactments, read as a whole, support the broader conclusion that the legislature intended the 1992 enactments to reduce the criminal liability for possession of previously-used hypodermic syringes and needles by any injecting drug user in order to encourage injecting drug users to obtain sterile injecting equipment or at least to retain used equipment, rather than discarding or sharing it and thereby placing others at risk of infection of HIV and other blood-borne diseases.[14] The court must reconcile the various parts of the 1992 enactments to obtain a sensible and rational overall interpretation. *See Elliot*, 229 Conn. at 512, 642 A.2d 709. The court concludes that the legislature intended by its 1992 enactments both to expand the needle and syringe exchange programs and to expand the scope of the public health goal that animated the 1990 enactment: to prevent the spread of HIV and other blood-borne diseases by encouraging the use of sterile injection equipment and preventing the improper disposal of previously-used injection equipment. To do so, the

14. Although provisions enabling injecting drug users to keep previously-used syringes and needles may seem to risk promoting or facilitating sharing of used injection equipment, the legislature's 1992 enactment also provided ready access to sterile syringes and needles. Thus, the provisions of the 1992 enactments allow injecting drug users to obtain new injection equipment without necessarily having to exchange their used equipment, which reduces the incentive for users to share previously-used equipment, and decriminalize possession of previously-used equipment, which reduces the incentives for injecting drug users to improperly discard syringes and needles in order to evade arrest.

legislature made sterile injection equipment available without a prescription to injecting drug users outside of the needle and syringe exchange programs. Thus, after the 1992 enactments, the exemption of possession of a specific quantity of previously-used hypodermic syringes and needles from criminal liability reached all injecting drug users, and any injecting drug user could legally obtain injecting equipment in the same quantity outside of the then-expanded needle and syringe exchange programs. The legislature therefore knew that the changes in its drug enforcement statutes would reach non-exchange-program-participants and would allow injecting drug users to obtain sterile hypodermic syringes and needles from pharmacies without any system in place to require them to participate in the needle and syringe exchange programs.

Moreover, the legislature must be presumed to have known the effect that repealing section 21a–267(d), adding the broader exclusion from section 21a–267 liability under section 21a–240(20)(A)(ix), without explicitly adding a specific exception to section 21a–279 for only Exchange participants, would have on its existing criminal drug enforcement statutes, and it must be presumed to have intended that effect. In this vein, the court notes that previously-used "hypodermic syringes" and "hypodermic ... needles," which are exempted from criminal liability in specified quantities under section 21a–267(a), typically contain trace amounts of narcotic substances as residue. Additionally, the court notes, " 'the legislature is presumed to have created a consistent body of law.' " *Valerie D.*, 223 Conn. at 524, 613 A.2d 748 (citations omitted).

Applying these principles, the court concludes that, read as a whole, the 1992 enactments provided for the decriminalization of the possession by any person of any trace amounts of drugs contained as residue within previously-used syringes and needles. The defendants in essence argue that the interpretation of section 21a–279(a) that the plaintiff class advocates involves an implied repeal of the criminal drug statute prohibiting the possession of narcotic substances and that such repeals are strongly disfavored. The

court notes, however, that Conn. Gen.Stat. § 21a–279(a) expressly prohibits the possession or control of "any quantity of any narcotic substance, *except as authorized in this chapter.*" (emphasis added). In enacting section 21a–279(a), therefore, the legislature contemplated that it had and may from time to time authorize possession of narcotic substances which would not fall within the criminal drug possession prohibition under section 21a–279(a). The court is therefore not engaged in an implied repeal but rather in recognizing that possession of trace amounts of narcotic substances is authorized by the legislature in order to harmonize section 21a–279(a) with Conn. Gen.Stat. §§ 19a–124 and 21a–240(20)(A)(ix). As such, these trace amounts are therefore not criminalized under section 21a–279(a). In the face of the persuasive evidence that the legislature had a different intention for its 1992 enactments than it had for its 1990 enactment, the court must conclude that it would lead to an absurd result to interpret the 1992 enactments to have expanded the availability of and exemption from criminal liability for possession of a specified quantity of previously-used hypodermic syringes and needles by any injecting drug user without exempting injecting drug users from criminal liability for possession of trace amounts of narcotic substances contained as residue within such specified quantities of previously-used hypodermic syringes and needles.

The defendants also argue that this interpretation of the relevant criminal drug possession statutes is too expansive and would exclude syringes and needles full of narcotic substances from criminal liability for drug possession or sale under sections 21a–277, 21a–278, 21a–278a, and 21a–279(a). *See* Memo. of Law of Defendants (Dkt. No. 23) at 30. This argument, however, ignores the limits of the term "used." The court concludes in this case only that the legislature intended to decriminalize possession of previously-used syringes and needles containing trace amounts of narcotics as residue and that residue itself. This interpretation squares with the purpose of the 1992 enactments to increase the availability of sterile injection equipment to injecting drug users and to reduce the incidence of the improper

disposal of or sharing of previously-used, potentially-infectious injection equipment. The commonly approved meaning of "used" in this instance would be syringes and needles which have already been used to inject narcotic substances, *i.e.*, which contain only trace, *i.e.*, not usable, amounts of narcotic substances. Moreover, the legislature has used the term "residue" in this context in section 21a–270(3). "Residue" is commonly defined as "[m]atter left after *completion* of an abstractive chemical or physical process, such as evaporation, combustion, distillation, or filtration." *Webster's II New College Dictionary* 943 (1995) (emphasis added); *see also State v. Albert*, 252 Conn. 795, 807, 750 A.2d 1037 (2000) ("We also note that, when 'a statute or regulation does not sufficiently define a term, it is appropriate to look to the common understanding of the term as expressed in a dictionary.'" (citation omitted)). The court therefore rejects the defendants' argument that the construction the court has placed on section 21a–279(a) will legalize the possession of the narcotic substances in a full or not-yet-used or even partially-used syringe or needle.[15]

The court further observes that the legislative history of the 1992 enactments, although not conclusive, is supportive of the court's interpretation of the purpose and effect of the 1992 amendments. The parties have each provided various excerpts from the legislative history of the 1990 and 1992 enactments at issue in this case, including several portions of the floor debate. "'Although statements made on the floor of the legislature are not controlling on statutory interpretation, we may take judicial notice of those statements, which are strong indications of legislative intent.'" *State v. Guckian*, 226 Conn. 191, 199–200, 627 A.2d 407 (1993) (citation omitted).

The defendants point primarily to legislative history surrounding the 1990 enactment for the purpose of arguing that the legislature did not intend to decriminalize the possession by non-exchange-program-participants of hypodermic syringes or needles and trace amounts of narcotic substances contained therein as residue. *See* Memo. of Law of Defendants (Dkt. No. 23) at 19–27. The court concurs, as discussed above, that the provisions of P.A. No. 90–214 only decriminalized such possession for the New Haven needle and syringe exchange program participants.

More pertinent, then, is the legislative history surrounding the 1992 enactments. The court finds that this history is not supportive of the defendants' argument that the legislature never "intended in any way shape or form to permit all intravenous drug.users to be immune from arrest if they had simply trace amounts or residue of narcotics contained in the needles they are legally permitted to possess pursuant to C.G.S. 21a–240." *Id.* at 19. The exchange between Representatives Tulisano and Lescoe on which the defendants largely rely is internally inconsistent and generally incoherent and, at any event, provides no useful guidance to the court in discerning the legislature's intent on the issue at hand. *See id.* at 28; *see also* 35 H. Proc., Pt. 16, 1992 Sess. (H–638), pp. 5263–65. On the other hand, an exchange between Representatives Cocco and Tulisano strongly suggests that the legislators recognized that passing P.A. No. 92–185 would decriminalize the possession of trace amounts of narcotic substances contained as residue within a specified quantity of previously-used hypodermic syringes and needles. *See id.* at pp. 5297–5301.

The legislative history also supports the view that, contrary to the defendants' position, the decriminalization effected by P.A. No. 92–185 was not intended to be restricted to possession by needle and syringe exchange program participants. Remarks by

---

**15.** The court also notes that the defendants' argument that the interpretation the plaintiffs advocate will somehow open the door to legalized drug trafficking is at odds with the defendants' "conce[ssion], for purposes of this action, that an individual who is part of the [Exchange] would be exempt from arrest if all that they had at the time of a police stop was the needles to be exchanged, which needles contained residue only," and the defendants' "agree[ment] that the intent of the Connecticut General Statutes § 19a–124, which encourages a return of needles to the [Exchange], would be thwarted with any other interpretation." Memo. of Law of Defendants (Dkt. No. 23) at 11 n. 1.

Representative Collins suggest that the purpose of amending section 21a–65(b) in the 1992 enactments was explicitly to make clean injection equipment readily available to injecting drug users who are not inclined to use the needle and syringe exchange programs and who can afford to buy their own equipment, for the purpose of stopping the spread of HIV and other blood-borne diseases through improperly discarded, previously-used and potentially-infectious syringes and needles and needle-sharing. *See id.*, pp. 5270–71; *see also id.*, pp. 5348–49 (remarks of Representative Taylor). Furthermore, opponents of P.A. No. 92–185 actually argued that the bill made needle and syringe exchange programs redundant or unnecessary and urged the defeat of the bill on the view that decriminalizing the possession of specified quantities of hypodermic syringes and needles and providing for sale of injection equipment by pharmacies without a prescription unwisely broadened the scope of the availability of drug injection equipment previously available only through the exchange programs under section 19a–124. *See, e.g., id.*, p. 5339 (remarks of Representative Nystrom). Opponents worried that P.A. No. 92–185 would prevent police departments from getting convictions for the possession on needles and syringes. *See id.*, p. 5301 (remarks of Representative Cocco); *id.*, p. 5339 (remarks of Representative Nystrom); 35 S. Proc., Pt. 10, 1992 Sess. (S–338), pp. 3376–77 (remarks of Senator Nickerson). Proponents of the bill argued that the needle and syringe exchange programs would complement the operation of the provisions of P.A. No. 92–185 to achieve the public health purposes of the legislation. *See, e.g.*, 35 H. Proc., Pt. 16, 1992 Sess. (H–638), pp. 5348–49 (remarks of Representative Taylor); 35 S. Proc., Pt. 10, 1992 Sess. (S–338), pp. 3377–78 (remarks of Senator Matthews). The House even rejected a proposed amendment to the bill later enacted as P.A. No. 92–185, which would have repealed the exchange programs under section 19a–124 as unnecessary in light of the other provisions of P.A. No. 92–185. *See* 35 H. Proc., Pt. 16, 1992 Sess. (H–638), pp. 5344–49. When the House later took up consideration of the bill to expand the scope of section 19a–124, which the legislature enacted as P.A. No. 92–3, opponents of the bill worried that expanded needle and syringe exchange programs were unnecessary in light of the enactment of P.A. No. 92–185. *See* 35 H. Proc., Pt. 22, 1992 May Spec. Sess. (H–644), pp. 7273–74 (remarks of Representative Winkler). Thus, after considering the concerns raised by opponents of this 1992 legislation, the legislature passed enactments in 1992 providing for both the legal possession and sale of specified quantities of hypodermic syringes and needles without a prescription and the operation of expanded needle and syringe exchange programs in New Haven, Bridgeport, and Hartford.

The legislative history thus largely supports the conclusion that the legislature intended by its 1992 enactments to decriminalize possession of specified quantities of hypodermic syringes and needles and any trace amounts of narcotic substances contained therein as residue. Accordingly, the court finds the legislative history of the 1992 enactments to be largely supportive of the interpretation of sections 21a–267 and 21a–279(a) reached by the court.[16]

---

**16.** The defendants have also submitted a December 14, 2000 affidavit of a member of the Connecticut House of Representatives who was a member of the legislatures that passed the relevant statutory enactments at issue in this case. *See* Affidavit of Jackie Cocco (Dkt. No. 35). The affidavit seeks to explain the intent of the legislature in passing these enactments. *See id.* at ¶¶ 9–10. The court notes that Representative Cocco voted against the passage of P.A. No. 92–185, and that "the comments of opponents of a bill ordinarily are entitled to less weight than are those of its proponents." *Cotto v. United Techs. Corp.*, 251 Conn. 1, 12 n. 7, 738 A.2d 623 (1999) (citations omitted). At all events, under long-standing principles of statutory construction, the court is not permitted to accord any significance or weight to this proffered statement of one legislator's post-enactment view of legislation passed in 1990 and 1992. "Post-enactment views of those involved with the legislation should not be considered when interpreting the statute." 2A Singer, *Sutherland Statutory Construction* (5th ed. 1999 Supp.) § 48:20, at 184; *see also Citizens for Fair Gov't v. Bd. of Selectmen*, No. 553964, 2000 WL 1269293, at *3 (Conn.Super.Aug.22, 2000) (quoting 2A Singer, *Sutherland Statutory Construction* (6th ed.2000) § 48:20, at 488–89).

Finally, the court finds that the conclusion that the legislature, through its 1992 enactments, decriminalized the possession of trace amounts of drugs contained as residue within previously-used syringes and needles by any injecting drug user comports with both common sense and the requirement that the court assume that the legislature intended to accomplish a reasonable and rational result. Criminalizing the possession of trace amounts of narcotics within decriminalized, previously-used hypodermic syringes and needles would lead to absurd results which would thwart the public-health purpose behind the 1992 legislation: discouraging needle and syringe exchange program participants from transporting previously-used injection equipment to the Exchange, and encouraging all injecting drug users to hastily and likely improperly abandon now-easily-obtainable injection equipment after one use in order to avoid arrest.

The court concludes that the 1992 enactments are designed to prevent the sharing and the improper disposal of previously-used, potentially-infectious injection equipment by making sterile equipment readily and legally available to injecting drug users. The court therefore cannot accept the suggestion that the legislature intended for injecting drug users to remain subject to arrest for possession of trace amounts of narcotic substances in previously-used syringes and needles after the 1992 enactments when common sense dictates that an injecting drug user, faced with such liability, will rationally discard previously-used injection equipment wherever he or she uses it, such as a public restroom or a park bench, the very behavior the legislature sought to discourage.

The legislature also cannot reasonably be supposed to have required injecting drug users to thoroughly scrub and sterilize previously-used injection equipment to avoid criminal liability. Such a requirement would render the purpose of the exchanges and the provisions establishing ready availability of new injection equipment through pharmacies without a prescription largely superfluous.

Moreover, the court concludes that the 1992 enactments must have been intended to exclude from the scope of Conn. Gen.Stat. § 21a–279(a) the possession of trace amounts of narcotic substances which is often contained as residue within previously-used injection equipment. The 1992 legislation would be pointless if the legislature intended only to exempt from criminal liability the possession of sterile, albeit "used," injection equipment, i.e., not newly acquired from a pharmacy or the Exchange. Sterile equipment is not infected with blood-borne diseases such as HIV and thus does not pose a public health threat of the sort that the 1992 enactments were clearly intended to address. Finally, the court notes that maintaining criminal liability for possession of trace amounts of narcotic substances as residue within previously-used injection equipment would invite the Bridgeport police to abuse the fourth amendment by arresting any injecting drug user found with previously-used injection equipment before probable cause for a violation of section 21a–279(a) can be established through testing of the equipment for trace amounts of narcotics.

The court is aware that the Connecticut Appellate Court has refused to read into section 279(a) "a threshold amount or usability requirement not contained in § 21a–279(a)." *State v. McCarthy,* 25 Conn.App. 624, 630, 595 A.2d 941 (1991), *cert. denied,* 220 Conn. 925, 598 A.2d 366 (1991). The Appellate Court employed several canons of statutory construction, as well as prior Connecticut Supreme Court precedent, to arrive at its conclusion "declin[ing] to require any minimum amount or usability requirement before a conviction may be had pursuant to § 21a–279(a)." [17] *Id.* at 629, 595 A.2d 941.

*McCarthy* does not, however, control the analysis in the instant case. The controlled substances at issue in *McCarthy* are factually distinct from the residual quantities of narcotic substances at issue in this case. McCarthy was convicted under section 21a–

---

**17.** The court finds that its analysis is not in tension with this holding from *McCarthy* because the earlier discussion of the non-usability of trace amounts of narcotic substances contained as res-

idue in previously-used hypodermic syringes and needles serves only to explicate the meaning of the terms "used," "residue," and "trace amounts." *See supra* at 59–61.

**350**

279(a) for possession of " 'bits and pieces' of a white powdery substance from the dashboard, the front passenger seat and the rear seats," which was tested and revealed to be cocaine. *Id.* at 625–26, 595 A.2d 941. The narcotic substances contemplated under the limited interpretation of section 21a–279(a) which intersects with sections 21a–240(20)(A)(ix), 21a–267(a), and 21a–270(3), on the other hand, involve only narcotic substances already contained within a previously-used hypodermic syringe or needle. Moreover, unlike the cocaine at issue in *McCarthy*, which did not implicate the 1992 amendments to section 21a–240(20)(A)(ix), the narcotic substances at issue here would only be "residue" to the extent the trace amounts are located within a syringe or needle. Furthermore, *McCarthy* did not involve any statutory language that would arguably place the possession at issue in that case outside the scope of the criminal drug enforcement statutes, and the Appellate Court did not have occasion to apply the language in section 21a–279(a) criminalizing possession "except as authorized in this chapter." In contrast, the possession of trace amounts of narcotic substances contained as residue within previously-used hypodermic syringes and needles implicates this language as well as the entire course of enactments between 1990 and 1999 discussed above and the explicit amendments to sections 21a–267(d) and 21a–240(20)(A)(ix).

The court thus finds nothing in *McCarthy* that conclusively suggests that the Connecticut Supreme Court would find a defendant liable under section 21a–279(a) for possession of trace amounts of narcotic substances contained as residue within previously-used injection equipment. Rather, the court concludes that the Connecticut Supreme Court, guided by an effort to search for the intent of the lawmakers in passing the enactments at issue in this case, would reach the conclusion discussed above. *See Sweetman*, 249 Conn. at 307, 732 A.2d 144. Looking to the plain language, course of enactments, legislative history, and purpose of the various enactments, the court concludes that the Connecticut Supreme Court would reach the conclusion that the legislature intended to decriminalize the possession of specified quantities of sterile and previously-used hypodermic syringes and needles and trace amounts of narcotic substances contained as residue therein, even to the extent that this intent "must prevail over the literal sense and the precise letter of the language of the statute." *Id.* (citations and internal quotation marks omitted). As such, the court finds that the plaintiff class has succeeded on the merits of the fourth amendment claims alleged against the defendants. Accordingly, the plaintiff class is entitled to the permanent injunctive relief it seeks.

## IV. CONCLUSION

For the reasons stated above, the plaintiffs' motion for class certification [Dkt. No. 24] and request for a permanent injunction [Dkt. No. 1] are granted. Pursuant to Fed. R.Civ.P. 65(a)(2), the court hereby orders that:

Defendants Bridgeport Police Department and Wilber L. Champan, Chief of the Bridgeport Police Department, their agents, employees, assigns, and all persons acting in concert or participating with them are enjoined and restrained from searching, stopping, arresting, punishing or penalizing in any way, or threatening to search, stop, arrest, punish or penalize in any way, any person based solely upon that person's possession of up to thirty sets of injection equipment, within the scope of Conn. Gen.Stat. § 21a–240(20)(A)(ix), whether sterile or previously-used, or of a trace amount of narcotic substances contained therein as residue.

The clerk is directed to enter judgment and close the case.

**SO ORDERED.**